**Joseph M. Alioto,** SBN #42680, Pro hac vice pending
jmalioto@aliotolaw.com
**ALIOTO LAW FIRM**
One Sansome Street
San Francisco, CA   94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200

**Christopher L. Cauble,** OSB No. 962374
ccauble@thecaublefirm.com
**Rachele R. Selvig,** OSB No. 095016
rselvig@thecaublefirm.com
**CAUBLE & CAUBLE, LLP**
111 SE Sixth Street
Grants Pass, OR   97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704
**[See additional attorneys listed on signature page]**

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| JAMES DEHOOG, BRIAN BOUTELLER, SHONNA BOUTELLER, CARLY BOWEN, TOM BUTTERBAUGH, ERICA I. CORONA, MARIA G. CORONA, CHRIS DENNETT, JOHN DESBIENS, MATTHEW JOHNSON, CYNTHIA A. KREITZBERG, EDWARD LAWRENCE, JERUSHA MALAER, ROBERT MALAER, MICHAEL MARTIN, MICHAEL MCATEE, DAVID MILLIGAN, JEFF REEDER, RALPH REEDER, WADE SCAGLIONE, BETH H. SILVERS, BRADLEY O. SILVERS, and PATRICE WADE; | Case No. 1:15-cv-02250 |
| Plaintiffs; | |
| v. | **COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF SABMILLER PLC BY ANHEUSER-BUSCH INBEV, SA/NV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18** |
| ANHEUSER-BUSCH INBEV, SA/NV and SABMILLER PLC; | |
| Defendants. | |

Page 1 - COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF SABMILLER PLC BY ANHEUSER-BUSCH INBEV, SA/NV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18

COME NOW the plaintiffs by and through their undersigned attorneys, bring this civil action under the federal antitrust laws to enjoin the planned acquisition by the nation's largest beer company, defendant Anheuser-Busch InBev, SA/NV ("ABI"), of the nation's second largest defendant, SABMiller, plc ("SAB"), and to obtain equitable and other relief as appropriate.

## SUMMARY OF ACTION

### 1.

This is a private antitrust suit brought under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) to permanently prohibit the proposed acquisition by ABI, the largest brewer in the United States and world, of the second largest brewer in the United States, SAB—which includes Miller Coors, LLC, a joint venture between SAB and Molson Coors Brewing Co.—in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18), in that the acquisition may, and most probably will, substantially lessen competition and/or tend to create a monopoly in the production, distribution, and sale of beer in the United States.

### 2.

The United States is the most profitable beer market in the world.

### 3.

The U.S. beer industry—which serves tens of millions of consumers at all income levels—is highly concentrated with the two defendant firms accounting for approximately 71 percent of all sales volume nationwide. The proposed acquisition by ABI of SAB significantly threatens consumer welfare by the threatened increase in price, deterioration of quality, curtailment of innovation, destruction of consumer choice, and the elimination of actual and potential competitors and significant rivals in a non-trivial transaction. By combining the largest and the second-largest brewers of beer sold in the United States, the defendant, ABI, would be a

Page 2 - COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF SABMILLER PLC BY ANHEUSER-BUSCH INBEV, SA/NV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18

global beer behemoth with a market value of roughly $275 billion, and 71 percent of the beer market in the United States, sufficient monopoly power to exclude competition and raise prices. Plaintiffs, therefore, seek to enjoin this acquisition and prevent a serious violation of Section 7 of the Clayton Act.

4.

For the foregoing and following reasons, the proposed acquisition may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act.

**JURISDICTION**

5.

This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to prevent the defendants from consummating the acquisition as a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

6.

This Court has personal jurisdiction over the defendants. Defendants do over a billion dollars of business annually in Oregon, have substantial ownership in companies and breweries located in Oregon, including Widmer Brothers (now known as the Craft Brew Alliance) and Henry Weinhard's Brewing Company. Defendants also own "10 Barrels" brewing company which is a company that started and continues doing business in Oregon. Defendants distribute their products throughout Oregon and have a substantial economic business in Oregon. Defendants, therefore, have substantial contacts within the State of Oregon.

7.

Venue is appropriate in the United States District Court for the District of Oregon, Medford Division, pursuant to 28 U.S.C. § 1391and LR 3-2(b), because most of the plaintiffs are residents of Southern Oregon and counties comprising the Medford Division. Oregon is one of the largest craft beer producers in the world and will be significantly impacted by the actions alleged herein. According to Brewers Association.Org state craft and beer sales and production statistics, Oregon has the third largest per capita craft beer industry in the United States. Oregon is, on a per capita basis, among the top five states in the consumption of craft beers. As of 2014, Oregon has 216 craft breweries with around 75 of those breweries located in Southern Oregon. There are 1,039,063 barrels of craft beer produced per year and the economic impact in Oregon is almost $2 billion, with a substantial percentage of those sales occurring in Southern Oregon. Southern Oregon is one of the most concentrated craft beer markets in the world. As a result of this, Southern Oregon consumers, as well as others from outside of Southern Oregon (including the plaintiffs), who purchase and consume all kinds of beer, including craft beers, will be substantially impacted by the acquisition alleged herein.

## PARTIES

### The Plaintiffs

8.

Each plaintiff named herein is an individual and a citizen of the state listed for each said plaintiff in Exhibit 1 which is incorporated herein by reference. Each plaintiff has purchased beer produced by one or both of the defendants and each plaintiff expects to continue to purchase beer produced by one or both of the defendants in the future. Plaintiffs are also consumers of craft beers made in Oregon. Each plaintiff is threatened by a loss or damage by reason of the acquisition in

that prices for beer may increase, quality may deteriorate, availability may be lessened, actual and

potential competition and the benefit of competition may be curtailed or even eliminated, and

consumer choice may be destroyed.

## The Defendants

9.

ABI is a multinational beverage and brewing company headquartered in Leuven, Belgium.

It is the world's largest beer brewer and has a 25 percent global market share. ABI was formed

through successive mergers of three international brewing groups: Interbrew from Belgium,

AmBev from Brazil, Anheuser-Busch from the United States and Grupo Modelo from Mexico.

10.

Also in 2008, ABI's predecessor, InBev, then the largest brewer in the world, acquired

Anheuser-Busch for $50 billion, making ABI the largest brewer of beer in the United States,

accounting for more than 46 percent of the U.S. market. In 2013, ABI acquired the portion of the

Mexican brewer Grupo Modelo it did not already own in a deal valued at $20.1 billion.

11.

ABI has 16 brands that individually generate more than $1 billion annually in revenue, out

of a portfolio of more than 200 brands, which includes such global brands as Budweiser, Corona

and Stella Artois, international brands such as Beck's, Hoegaarden and Leffe, and local brands

such as Bud Light, Modelo Especial and Michelob Ultra. Total revenue for all 200 ABI brands in

2014 was over $47 billion.

12.

ABI is the largest seller of beer in the United States, accounting for more than 46 percent of

the market.

13.

SAB is a South African multinational brewing and beverage company, headquartered in London, England. It is the world's second largest brewer measured by revenues, after ABI. Its brands include Miller, Fosters, Grolsch, Peroni and Pilsner Urquell. It has operations in 80 countries world-wide. From the early 1990s onward, the company has increasingly expanded internationally, making several acquisitions in both emerging and developed markets. In 1999, it formed a new United Kingdom-based holding company, SAB plc. In May 2002, SAB plc acquired Miller Brewing Company, forming defendant SABMiller plc.

14.

On July 1, 2008, SAB and Molson Coors Brewing Company, then the number two and three brewing companies in the United States, respectively, combined their operations and began operating a joint venture in the United States. The joint venture, MillerCoors, LLC, is headquartered in Chicago, Illinois. Its brands include: Miller Lite, Miller Genuine Draft, Olde English 800, Milwaukee's Best, Miller Chill, and Hamm's. The company also offers a variety of craft and import brands, including Blue Moon and Leinenkugel's, through its Tenth and Blake division. MillerCoors also brews brands of beer that are owned by Pabst Brewing Company. MillerCoors is the second-largest beer company in the United States, with 25 percent of U.S. beer sales. Total revenue for all SAB brands in 2014 was over $22.31 billion.

15.

In September 2014, SAB made an unsuccessful attempt to acquire a controlling stake in Dutch rival Heineken International, a move reported to be part of SAB's strategy to protect itself from a potential takeover bid by ABI.

16.

On October 13, 2015, the deal by ABI to acquire SAB was first announced. On November 11, 2015, the purchase price was reported to be approximately $108 billion. The deal would unite the world's two biggest beer makers and control more than half the world's beer profits.

17.

In a summary of the transaction, released by the defendants on November 11, 2015, the acquisition was described as follows:

- The boards of ABI and SAB announced that they reached agreement on the terms of a recommended acquisition of the entire issued and to be issued share capital of SAB by ABI.

- The transaction will be implemented by means of the acquisition of SAB by Newco (a Belgian company to be formed for the purposes of the transaction). ABI will merge into Newco so that, following completion of the transaction, Newco will be the new holding company for the merged entity.

18.

In the release of November 11, 2015, the defendants stated the acquisition is proposed to occur according to a three-stage process they described as follows:

It is intended that the Transaction will be implemented by way of a three stage process involving: (i) a UK law court-sanctioned scheme of arrangement under Part 26 of the Companies Act 2006 pursuant to which each UK Scheme Shareholder will receive 100 Initial Shares in Newco in respect of each of its SABMiller Shares; (ii) a Belgian law voluntary cash takeover offer by AB InBev for all of the Initial Shares pursuant to the Belgian Law of 1 April 2007 on takeover bids and the Belgian Royal Decree of 27 April 2007 on takeover bids pursuant to which SABMiller Shareholders who wish (or are deemed) to elect to do so will receive the Cash Consideration in return for their Initial Shares and SABMiller Shareholders who wish to elect to receive the Partial Share Alternative will receive the cash element of the Partial Share Alternative and retain the relevant proportion of their Initial Shares, which will become Restricted Shares; and (iii) a Belgian law reverse merger of AB InBev and Newco under the Belgian Companies Code pursuant to which AB InBev Shareholders will become shareholders in Newco and Newco will be the surviving entity and the new holding company of the Combined Group.

Further details of the intended structure of the acquisition were included in the release.

19.

One of the conditions precedent to consummating the acquisition is compliance with the antitrust laws of the United States, including the absence of judicial action to prohibit the acquisition.

20.

The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. The threshold for "highly concentrated" is an HHI of 2,500. Transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission. Here, the market concentration will substantially exceed that number.

21.

The HHI of the United States beer market in 2014 was 2,751. It has been reported by experts that ABI's acquisition of SAB would increase that HHI by 2,998 points and, even assuming a complete divestiture of SAB's U.S.-marketed beers, the HHI would increase by at least 200 points which in the already highly concentrated U.S. market is presumptively illegal under government guidelines. The post-acquisition HHI plainly indicates a market ripe for probable, if not certain, collusion and a galloping tendency toward monopoly.

22.

The market concentration measures, coupled with the significant increases in concentration, demonstrate that the acquisition is presumed to be anticompetitive.

23.

The proposed acquisition is contrary to the following long-established decisions by the United States Supreme Court: *Brown Shoe Co. v United States*, 370 U.S. 294 (1962); *United States v. Philadelphia National Bank,* 374 U.S. 321 (1963); *United States v. Aluminum Co. of America,* 377 U.S. 271 (1964); *United States v. Von's Grocery Co*., 384 U.S. 270 (1966); *United States v. Pabst Brewing Co.,* 384 U.S. 546 (1966); *United States v. Falstaff Brewing Co.,* 410 U.S. 526 (1973). As Judge Posner of the Seventh Circuit observed, these cases have never been overruled, and "[t]aken as a group, . . . establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing. The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words 'may . . . substantially . . . lessen competition.'" *Hospital Corp of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).

24.

ABI and SAB have actively competed in the United States, although not generally with regard to price. An interdependent pricing dynamic exists between ABI and SAB in the United States. These two largest brewers find it more profitable to follow each others' prices rather than compete aggressively for market share by cutting price. ABI typically initiates annual price increases in various markets with the expectation that SAB will follow. Often it does. The defendants' competition has, however, resulted in product innovations that have benefitted consumers across the country. The proposed acquisition would eliminate this type of competition by further concentrating the beer industry, enhancing ABI's market power, and facilitating coordinated pricing between ABI and what will be the next largest brewer, Constellation Brands,

Inc. ("Constellation"), which markets the Mexican brewer Grupo Modelo's beer products in the United States, including the country's largest selling import, Corona, under an exclusive license from ABI which owns 100 percent of Grupo Modelo ("Modelo").

25.

Plaintiffs are consumers and purchasers of defendants' beers and are threatened with loss and damage in the forms of higher prices, fewer services, fewer competitive choices, diminished product quality and product diversity, suppression and destruction of smaller actual competitors through exclusive distribution arrangements, full-line forcing, and the like, and other anticompetitive effects and consequences that may, and most probably will, result from the elimination of actual and potential competition if the acquisition by ABI of SAB is consummated.

26.

Before it was completely acquired by ABI in 2013 for $20.1 billion, Modelo's then U.S. distributor, unlike SAB, had consistently resisted pressure to follow ABI-led price hikes. Modelo's then pricing strategy, called "The Momentum Plan," sought to maintain a narrow "price gap" between Modelo's beers and ABI's lower-priced premium domestic brands, such as Budweiser and Bud Light. Modelo put "increasing pressure" on ABI by pursuing a competitive strategy directly at odds with ABI's well-established practice of leading prices upward.

27.

Before Modelo's acquisition by ABI, ABI and SAB were forced to offer lower prices and discounts for their brands to discourage consumers from "trade[ing] up" to Modelo's brands. When ABI acquired the remaining interest in Modelo that it did not already own in 2013, and vested sole U.S. distribution rights for Modelo's U.S. sales in Constellation Brands, this competitive constraint on ABI's and SAB's ability to raise prices was eliminated.

28.

ABI's acquisition of Modelo eliminated the substantial head-to-head competition that then existed between ABI and Modelo in the United States. The loss of this head-to-head competition enhanced the ability of ABI to unilaterally raise the prices of the brands it owned post-acquisition, diminished ABI's incentive to innovate with respect to new brands, products, and packaging and, as alleged below, has resulted in price increases by Constellation of its Modelo brands in the United States, despite contrary assurances by the Department of Justice when it settled its suit to enjoin ABI's acquisition of Modelo as a violation of Section 7 of the Clayton Act, that the acquisition would not result in increases in the price of Modelo's products in the U.S. The impotent restrictions imposed by the Justice Department's settlement with ABI and Constellation will "sunset" in 2023, leaving ABI legally free to reacquire so-called "divestiture assets" and reenter the U.S. market directly with Modelo products.

29.

After settling with the government and completing its acquisition of Modelo, ABI continued to own distributors in key U.S. markets which allowed it to control the marketing and distribution of Modelo's products and the products of small craft brewers in those markets. Despite warnings and complaints raised at the time of the Justice Department's settlement in 2013 that ABI's continued control of these distributors would allow it to engage in anticompetitive activities, including by limiting craft brewers' access to ABI-owned distributors and, in turn, restricting access to retail outlets, and allowing ABI to increase the price of Modelo's products through ABI's own distributors, these warnings were ignored by the Department of Justice and the court which ultimately approved the settlement.

30.

The harms which were warned of have come to pass. The prices of ABI's products in the U.S., and Modelo's brands, have increased since the acquisition and competitors, particularly small craft brewers who until recently had the most robust growth in the U.S. beer market, have been injured by ABI's recent practices.

31.

ABI has the country's largest network of independent distributors/wholesalers, numbering approximately 600. Almost all of the distributors, although independent, operate under exclusive agreements with ABI in which they agree not to deal with the products of any competitors and not to distribute any products outside of their own designated territories. In addition, ABI owns 14 distributors/wholesalers in the following cities: Boston, Massachusetts; Canton, Ohio; Denver, Colorado; Eugene, Oregon; Los Angeles, California; Louisville, Kentucky; New York, New York; Oahu, Hawaii; Oklahoma City, Oklahoma; Pomona, California; Riverside, California; San Diego, California; and Tulsa, Oklahoma.

32.

The proposed acquisition is likely to lead to a decrease in small brewers' access to distributors. The beer market in the United States is predominantly a three-tiered system because state regulations in most states require that the brewer sell to a distributor who then sells to retailers. In its challenge to ABI's acquisition of Modelo, the Department of Justice demonstrated that, "[e]ffective distribution is important for a brewer to be competitive in the beer industry." Large companies can and do use their market power to exert a tremendous amount of influence over what beer brands distributors carry. This is important because ABI and SAB's MillerCoors joint venture has pursued different strategies in their dealings with distributors in the United States.

ABI has pursued a strategy of exclusivity, and has in the past given more favorable terms to distributors who only sell brands owned by ABI. This 100 percent share strategy has led ABI to pressure distributors to drop other brewers' brands. On the other hand, MillerCoors has permitted its distributors to carry rival brands. However, there are no guarantees or known provisions in the ABI-SAB deal to require MillerCoors to keep its strategy in place, post-acquisition.

33.

In fact, since the proposed acquisition contemplates SAB selling its interest in the MillerCoors joint venture to its co-joint venturer, Molson Coors, it is likely that a 100 percent Molson Coors-owned MillerCoors will follow ABI's lead in its dealings with distributors. Before the MillerCoors joint venture, SABMiller and Molson Coors successfully shared distributorships and recognized the importance of being open to many suppliers. They likely chose this strategy, because each had relatively small market share compared to ABI. MillerCoors continued the same strategy when it was under the management of SABMiller and Molson. Given the resulting change in management and Molson's new increased size and scope in the U.S. market following the ABI-SAB acquisition, Molson's management is likely to have incentives to change its practices to match ABI's, much as Constellation Brands did after acquiring the exclusive license to market Modelo's brands in the U.S. after ABI acquired Modelo. This fall, for the first time, Constellation has led beer price increases, rather than acting as a deliberate restraint on price increases. As but one example, Molson is likely to change its policy and pressure distributers to stop carrying white beers that compete with Blue Moon, over which Molson will receive U.S. rights in the proposed deal.

/ / /

/ / /

34.

The seriousness of the problem is exacerbated by the fact that ABI is currently the largest distributor in the United States, with $3 billion in sales and 135 million in case volume, and the largest beer supplier with approximately 45 percent of the market. After the acquisition,   Molson will have exclusive control over 26 percent of beer sales, or more than the next eight largest brewers combined.

35.

ABI has already embarked on a plan to restrain the distribution of competitors' products, including those of craft brewers, through its own distributors, as well as through other, non-ABI-owned distributors whom it pressures to obstruct the distribution of competitors' products. With specific reference to a potential ABI-SAB acquisition, the American Antitrust Institute warned the Department of Justice in November 2014, that "[o]n account of its size, ABI already exercises a domineering presence over its distributors. For a distributor, a falling out with ABI could mean losing brands that account for 40 percent of the national market—a figure that is certainly higher in many markets." To further enhance the effectiveness of its anticompetitive practices, ABI has embarked on a plan to acquire additional distributors around the United States.

36.

On October 12, 2015, the Department of Justice announced it has launched an investigation into ABI's practices, including the acquisition of two distributors in the San Jose and Oakland, California markets. Reuters reported:

> The U.S. Justice Department is probing allegations that Anheuser-Busch InBev (ABI.BR) is seeking to curb competition in the beer market by buying distributors, making it harder for fast-growing craft brewers to get their products on store shelves, according to three people familiar with the matter.

In the past few months, the world's largest brewer has rattled the craft beer world by striking deals for five distributors in three states. Many states require brewers to use distributors to sell their product, and once AB InBev buys a distributor, craft companies say they find that they can't distribute their beer as easily and sales growth stalls. Antitrust regulators are also reviewing craft brewers' claims that AB InBev pushes some independent distributors to only carry the company's products and end their ties with the craft industry, two of the sources said, noting that the investigation was in its early stages.

37.

Referring again to an ABI-SAB combination, the American Antitrust Institute informed the Justice Department: "With an even larger market share, ABI would have more power over distributors and more to gain from excluding rivals."

38.

Predictably, small craft brewers have been rattled by ABI's purchases of craft beer makers, including Golden Road Brewing in September 2015, Blue Point Brewing in 2014 and Goose Island Beer Co in 2011.

39.

An executive at a craft brewer is reported to have said that ABI recently bought one of its distributors. "It [the distributor] is slowly but surely divesting itself of everything that is not ABI. And we're one of the last ones," said the executive, who noted that its other options for distribution were limited. "We're at the mercy of a lot of big players."

40.

There were approximately 4,000 craft beer companies as of September, 2015, brewing everything from artfully made classics like Dale's Pale Ale, Brooklyn Lager and Gordon Biersch Hefeweizen, as well as more unusual brews like Breckenridge Vanilla Porter, and the super hoppy Palate Wrecker from Green Flash Brewing Co.

41.

Recently, craft brewers have been a rare bright spot in an otherwise sluggish U.S. beer market. While overall beer sales rose 0.5 percent in 2014, craft beer sales rose by 17.6 percent to capture 11 percent of the U.S. market.

42.

The elimination of or injury to the competition by craft brewers may substantially lessen competition or tend to create a monopoly in the beer market by depriving consumers of choice.

43.

To retain the "craft" title, a brewery must make less than six million barrels annually. That means those that are taken over by a big brewer like ABI lose that identity even if they still make small batches with distinctive flavors.

44.

These events and the Justice Department's investigation come at a time when ABI is seeking to buy the number two brewer, SAB, for an estimated $108 billion in what would be the biggest acquisition of a beer brewer by another brewer in history.

45.

ABI's acquisition of SAB will cause competitive harm to U.S. beer consumers by further enhancing ABI's ability to unilaterally raise the prices of the SAB and other brands it will own post-acquisition, and diminish ABI's incentive to innovate with respect to new brands, products, and packaging.

/ / /

/ / /

/ / /

46.

The Chief Executive Officer of ABI is Carlos Brito. By reason of his position, Mr. Brito controls and will control the manufacture, distribution, and sale of beer in the United States through ABI.

47.

Both ABI and SAB are owned by foreign interests.

48.

The acquisition will give complete control of SAB to ABI, and will give ABI full access to competitively sensitive information about the sale of SAB's brands in the United States – access that ABI does not currently have.

49.

More than 40 percent of the population of the United States consumes beer, including the beers of ABI and SAB, and each consumer will be adversely affected if the proposed unlawful transaction is allowed to proceed.

50.

The most influential factor in the sale of beer in the United States is advertising.

51.

ABI and SAB are substantial advertisers, having spent hundreds of millions of dollars in the last year alone.

52.

Prior to forming InBev in the merger of Belgium's Interbrew and Brazil's AmBev in 2004, the world's largest brewers were: (#1) Anheuser-Busch; (#2) SABMiller; (#3) Interbrew; (#4) Heineken; and (#5) AmBev. After the combination of Interbrew and AmBev, InBev became the

largest brewer in the world. When InBev acquired Anheuser-Busch in 2008, ABI's rank as the world's largest brewer was solidified. If the acquisition were allowed, the world's five largest brewers would be reduced to just two.

53.

As the world's largest brewer, ABI has enormous economic power and capabilities, with 16 brands alone that each generate over $1 billion per year in revenue out of a portfolio of more than 200 brands, and total revenues in 2014 for all ABI brands of more than $47 billion. ABI's post-acquisition prowess will also afford it monopsony power over the commodities used in brewing beer.

54.

Experts have concluded that ABI's new global scale, if the acquisition is permitted, will give it leverage over the commodities used in brewing beer and many other facets of the beer industry that will likely affect competition in the United States. The proposed acquisition would increase ABI's buying power by potentially controlling over 30 percent of total worldwide beer production. A combined ABI-SAB would have 58 percent of the global beer profit pool which far outweighs Heineken's 11 percent, it next closest competitor. Antitrust enforcement agencies look to post-merger buyer power because abusive buyer power can harm not only input sellers, but also other buyers.

55.

The beer industry, and especially small buyers like craft brewers, is particularly vulnerable to what is known as the "waterbed effect" due to capacity issues involved in the brewing and packaging of beer. The waterbed effect occurs when a powerful buyer demands lower prices or

other concessions from its suppliers, causing the supplier to, in turn, increase prices to smaller buyers or offer them otherwise worse terms.

56.

Hops are an essential ingredient in beer. Hops shortages occur frequently. Hops can only be grown in a limited geographic area and requires a lot of water to grow. Hop growing also has high startup costs and high quality hop plants can take years before they hit full production. These factors lead to frequent hops shortages that disproportionately impact craft brewers. Hops come in many varieties that can be roughly divided into two categories: bitter hops used in traditional lagers and aroma hops used predominantly by craft brewers to make more flavorful beers. ABI is a powerful buyer in the bitter hops market, which is highly commoditized, but does not yet have much market power in the aroma hops market. The deal could depress prices in the bitter hops market due to ABI's buyer power and other purchasers who put pressure on their suppliers to compete with ABI's lower costs. This may cause U.S. farmers to abandon the bitter hops market in favor of more profitable aroma hops, further decreasing the ability of other buyers to compete on lager style beers.

57.

Moreover, in the packaging of beer, large can-maker Crown Holdings, Inc. (formerly a partner with Constellation in the joint venture that distributed Modelo's products in the U.S. before ABI acquired Modelo), has recently reportedly dropped both new and existing small craft customers and lengthened lead times, suggesting capacities are becoming limited in the industry. The shortages of hops and can packaging disproportionately impact craft brewers.

58.

ABI's increased buyer power means that it will more likely get the inputs it wants, in the quantities it wants, and at the terms it wants. This is likely to disadvantage input providers, as ABI is notorious for demanding extremely favorable terms like 120-day payment terms. ABI's increased monopoly power is also likely to mean worse terms for every other buyer in the market, not just because suppliers are likely to raise prices to recover lost profits, but because of capacity limitations as well. Smaller buyers are likely to experience delays, poorer terms, and even unavailability. ABI would also be likely to exert its buyer power strategically to disadvantage rivals in this way.

**NATURE OF TRADE AND COMMERCE**

59.

Beer comprises a wide variety of brands and alcoholic beverages usually made from a malted cereal grain, flavored with hops, and brewed via a process of fermentation. Beer is substantially differentiated from other alcoholic beverages by taste, quality, alcohol content, image, and price.

60.

In addition to brewing, beer producers typically sell, market and develop different brands. Marketing and brand building take various forms including sports sponsorships, print advertising, national television advertising campaigns and, increasingly, online marketing.

61.

Most brewers use distributors to merchandise, sell, and deliver beer to retailers. Those end accounts are primarily grocery stores, large retailers such as Target and Wal-Mart, and convenience stores, liquor stores, restaurants, and bars which, in turn, sell beer to the consumer.

Beer brewed in foreign countries may be sold to an importer, which then arranges for distribution to retailers.

62.

ABI groups beer into four segments: sub-premium, premium, premium plus, and high-end. The sub-premium segment, also referred to as the value segment, generally consists of lager beers, such as Natural and Keystone branded beer, and some ales and malt liquors, which are priced lower than premium beers, made from less expensive ingredients, and are generally perceived as being of lower quality than premium beers. The premium segment generally consists of medium-priced American lager beers, such as ABI's Budweiser, and SAB's Miller and Coors brand families, including the "light" varieties. The premium plus segment consists largely of American beers that are priced somewhat higher than premium beers, made from more expensive ingredients and are generally perceived to be of superior quality. Examples of beers in the premium plus category include Bud Light Lime, Bud Light Platinum, Bud Light Lime-a-Rita, and Michelob Ultra.

63.

The high-end category includes craft beers, which are often produced in small-scale breweries, and imported beers. High-end beers sell at a wide variety of price points, most of which are higher than premium and premium plus beers. The high-end segment includes craft beers such as Dogfish Head, Flying Dog, and also imported beers, the best selling of which is ABI-owned Modelo's Corona. ABI also owns high-end beers including Stella Artois and Goose Island. Brewers with a broad portfolio of brands, like ABI, typically seek to maintain "price gaps" between each segment. For example, premium beer is priced above the sub-premium beer, but below premium plus beer.

64.

Beers compete with one another across segments and ABI and SAB brands are in regular competition with one another.

65.

The relevant product market is the production and sale of beer.

66.

The relevant geographic market is the United States. There is competition between brewers on a national level that affects local markets throughout the United States. Decisions about beer brewing, marketing, and brand building typically take place on a national level. In addition, most beer advertising is on national television, and brewers commonly compete for national retail accounts. General pricing strategy also typically originates at a national level. A hypothetical monopolist of beer sold in the United States would likely increase its prices by at least a small but significant and non-transitory amount. Accordingly, the United States is a relevant geographic market under Section 7 of the Clayton Act.

67.

Within the relevant market, the following well-defined submarkets may exist, which in themselves constitute relevant markets for antitrust purposes: Oklahoma City, Oklahoma; Salt Lake City, Utah; Tampa/St. Petersburg, Florida; Houston, Texas; Jacksonville, Florida; Minneapolis/St. Paul, Minnesota; Denver, Colorado; Birmingham/Montgomery, Alabama; Memphis, Tennessee; Las Vegas, Nevada; Dallas/Fort Worth, Texas; Orlando, Florida; Los Angeles, California; Phoenix/Tucson, Arizona; Raleigh/Greensboro, North Carolina; Portland/Medford, Oregon, Miami/Fort Lauderdale, Florida; Hartford, Connecticut/Springfield, Massachusetts; Richmond/Norfolk, Virginia; Chicago, Illinois; New York, New York; Atlanta,

Georgia; Sacramento, California; Boston, Massachusetts; San Diego, California; Baltimore, Maryland/Washington, DC; San Francisco/Oakland, California.

68.

The United States is the world's most profitable beer market.

69.

The number of major brewers operating plants in the United States has decreased for decades, resulting in a highly concentrated market.

70.

The relevant markets are highly concentrated and would become significantly more concentrated as a result of the proposed acquisition.

71.

ABI is the largest brewer of beer sold in the United States and SAB is the second largest. The remaining sales of beer in the United States are divided among Heineken and fringe competitors, including many craft brewers, which defendants have characterized as fragmented, small players.

72.

The beer industry in the United States is highly concentrated and would become substantially more so as a result of ABI's acquisition of SAB. Market share estimates demonstrate that in 20 of the 26 local geographic submarkets identified above, the post-acquisition HHI will exceed 2,500 points.

73.

ABI dominates the production and sale of beer in the United States.

74.

ABI has 46 percent of the beer market in the United States.

75.

SAB has 25 percent of the beer market in the United States.

76.

Heineken, the third largest brewer of beer in the world, has 4 percent of the beer market in the United States.

77.

None of the remaining brewers have as much market share in the United States as does Heineken.

78.

In the United States, ABI, post-acquisition, will have a combined market share of approximately 71 percent. The post-transaction HHI of the United States beer market has been estimated to increase by reason of the acquisition by nearly 3,000 points.

79.

The market concentration measures, coupled with the significant increases in concentration, described above, demonstrate that the acquisition of SAB by ABI is presumptively anticompetitive.

80.

Price is the most important consideration in the sale of beer. Indeed, ABI and SAB consider beer to be a commodity and that the only competition between them is with regard to advertising.

81.

Shelf space in major retail chains and other retail outlets is an important component in the

sale of beer. The person in charge is usually referred to as the "Category Captain" who determines which beer will be placed on which part of a store's shelves. These Category Captains are induced, coerced, and given gratuities in order to give ABI and SAB the best possible position on retail shelves. As the American Antitrust Institute has reported to the Department of Justice, an ABI acquisition of SAB will result in diminished visibility of competitors' products on retail shelves:

> Under the practice of "category management," many retailers have outsourced the management of their beer aisles to "category captains." In their designated product line, category captains, who are typically the leading manufacturer in the segment, select the particular brands to carry and also design the configuration of retail shelves. While this system can improve the retailer's sales and profitability, it is also ripe for anticompetitive abuse. A category captain can give greater shelf prominence to its own products and opt not to stock rival products. This type of opportunism frustrates competition on the merits and can doom lesser-known brands to failure.
> If ABI acquires Miller, it would have more power at the retail level to marginalize rivals. In beer, ABI is the leading category captain and, together with Miller, accounts for the overwhelming majority of category captaincies. From the perspective of retailer profitability, evidence suggests that ABI and Miller category captains, in some parts of the country, are devoting too much space to their own brands and too little to craft beers. Following an acquisition of Miller, ABI would control a greater number of beer aisles and have more power to manipulate retail shelves to promote its own brands and hurt rivals.

### 82.

ABI and SAB have typically announced annual price increases in late summer for execution in early fall. The increases vary by region, but typically cover a broad range of beer brands. In most local markets, ABI is the market share leader and issues its price announcement first, purposely making its price increases transparent to the market so its competitors will fall into line. In the past several years, SAB has followed ABI's price increases to a significant degree.

### 83.

The specifics of ABI's pricing strategy are governed by its "Conduct Plan," a strategic plan for pricing in the United States that reads like a how-to manual for successful price coordination.

The goals of the Conduct Plan include: "yielding the highest level of followership in the short-term" and "improving competitor conduct over the long-term."

84.

ABI's Conduct Plan emphasizes the importance of being "Transparent—so competitors can clearly see the plan." According to ABI, its Conduct Plan "increases the probability of [ABI] sustaining a price increase." ABI has implemented a "conduct plan," which, according to the Department of Justice, is intended by ABI to establish "the highest level of [price] followership" by its large rivals by being as "consistent," "simple" and "transparent" as possible. ABI believes that its Conduct Plan provides the highest possibility of "sustaining a price increase" and "ensuring competition does not believe they can take share through pricing."

85.

In the past several years, ABI's pricing strategy has led to many price increases in which SAB has joined.

86.

By contrast, in or around 2008, before ABI acquired all of Modelo, Modelo's U.S. distributor implemented its so-called "Momentum Plan" with Modelo's enthusiastic support. The Momentum Plan was specifically designed to grow Modelo's market share by shrinking the price gaps between brands owned by Modelo and U.S. domestic premium brands. By maintaining steady prices while the prices of premium beer continued to rise, Modelo narrowed the price gap between its beers and ABI's premium beers, encouraging consumers to trade up to Modelo's superior brands. The narrowed price gaps frustrated ABI and SAB because they resulted in Modelo gaining market share at their expense. With ABI's acquisition of Modelo, the Momentum Plan was eliminated, with the result that Modelo's prices increased in the fall of 2015.

87.

In a move that was unprecedented before ABI's acquisition of Modelo,   Constellation was the first brewer in 2015 to report a price hike. For its Modelo brands, such as Corona and Modelo Especial, Constellation announced it would raise prices by three percent in some states this fall, according to Beer Marketer's Insights. In California and Florida, prices will rise by about 75 cents. California alone accounts for about 25 percent of Constellation's total sales volume. These price increases would likely not have occurred had ABI not acquired 100 percent of Modelo and then outsourced distribution in the U.S. market to Constellation Brands which shared its desire to discontinue the Momentum Plan and raise Modelo brands' prices.

88.

ABI is now free of the downward pressure on prices Modelo exerted before its acquisition by ABI. If ABI is permitted to acquire SAB, the trend toward higher prices in the U.S. beer market will accelerate as ABI realizes its vision of leading industry prices upward, with SAB's MillerCoors' – post-acquisition, Molson Coors' – beers and others' following suit.

89.

The proposed acquisition will increase the ability of ABI and the remaining beer firms to coordinate by eliminating another competitor with the potential to thwart ABI's price increase leadership.

90.

The acquisition by ABI of SAB will likely raise barriers to entry and expansion, diminishing non-price competition and reducing choice for beer drinkers. Without access to efficient distribution and retail shelves, craft and other rival brewers may face greater difficulties in reaching American consumers.

91.

ABI and SAB are substantial and significant competitors and potential competitors in the United States.

92.

The production and sale of beer are in a continuous and uninterrupted flow of interstate commerce. Materials used in the production of beer are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

93.

National brewers possess significant competitive advantages over smaller or regional brewers. They are able to advertise on a nationwide basis, have greater prestige, larger distribution networks, and are less affected by weather and labor issues.

94.

Any restraint of trade in the beer sales market in the United States, including the restraints specifically alleged in this complaint, directly and substantially restrains and affects interstate commerce.

95.

Any agreement short of prohibiting ABI's acquisition of SAB will result in across the board price increases and restrictions in the craft brewers' ability to market their more desirable products to consumers as ABI exerts its enhanced power on its own and others' distributors/ wholesalers to obstruct the smaller brewers' ability to get their products to market and placed in retail beer outlets.

/ / /

/ / /

96.

As the foregoing paragraphs show, the effect of the acquisition, if consummated, may be substantially to lessen competition, or tend to create a monopoly in the production and sale of beer in the United States by eliminating SAB as an actual or potential competitor and giving to the new company monopoly power and the likelihood of collusion in the production, marketing, distribution and sale of beer products in the United States.

97.

By reason of the proposed acquisition, consumer choice and consumer welfare will be eliminated.

98.

By reason of the defendants' proposed acquisition, plaintiffs are threatened with loss or damage in the form of higher beer prices and less consumer options. If defendants' proposed transaction is consummated, plaintiffs will sustain irreparable harm for which damages will be unable to compensate plaintiffs, in that competition once lost cannot easily be restored. Accordingly, plaintiffs bring this action for both preliminary and permanent injunctive relief against ABI's acquisition of SAB.

## VIOLATIONS ALLEGED

### Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18

99.

Plaintiffs incorporate and reallege paragraphs 1 through 98 above.

100.

The conduct of ABI described hereinabove, specifically the agreement by ABI to purchase SAB, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, in that the

effect of the proposed acquisition may be substantially to lessen competition, or to tend to create a

monopoly in the production and sale of beer in the United States. By reason of the violation

plaintiffs are threatened with loss or damage in the form of higher beer prices and diminished

competition, as well as irreparable harm for which damages will be inadequate to compensate

plaintiffs, such that plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust

Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief to prohibit ABI's

acquisition of SAB, and to recover their costs of suit, including a reasonable attorney's fee.

101.

Unless restrained and enjoined, ABI will consummate the acquisition of SAB to the

immediate and irreparable damage of the plaintiffs and the consuming public.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand the following relief from this Honorable Court:

A.    Declaring, finding, adjudging, and decreeing that the agreement between

ABI and SAB proposing that ABI acquire SAB violates Section 7 of the Clayton

Antitrust Act, 15 U.S.C. § 18.

B.    Preliminarily enjoining ABI and those acting in concert with it from

consummating the acquisition of SAB during the pendency of this action.

C.    Permanently enjoining ABI from consummating the acquisition of SAB.

D.    Awarding to plaintiffs their costs of suit, including a reasonable attorney's

fee, as  provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

E.    Granting to plaintiffs such other and further relief to which they may be

/ / /

/ / /

Page 30 - COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF
SABMILLER PLC BY ANHEUSER-BUSCH INBEV, SA/NV AS A VIOLATION OF
SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18

entitled and which the Court finds to be just and appropriate in order insure

competition in the industry.

**DATED** this 1st day of December, 2015.

                                    **CAUBLE & CAUBLE, LLP**

                                    *s/Christopher L. Cauble*
                                    **Christopher L. Cauble**, OSB No. 962374
                                    ccauble@thecaublefirm.com
                                    **Rachele R. Selvig,** OSB No. 095016
                                    rselvig@thecaublefirm.com

                                    **ALIOTO LAW FIRM**
                                    **Joseph M. Alioto**, SBN #42680, Pro hac vice pending
                                    josephalioto@mac.com

                                    **MESSINA LAW FIRM, P.C.**
                                    **Gil D. Messina**, NJ #029661978, Pro hac vice pending
                                    gmessina@messinalawfirm.com
                                    961 Holmdel Road
                                    Holmdel, NJ   07733
                                    732-332-9300 Phone/732-332-9301 Fax

                                    **SEVERAID & GLAHN, P.C.**
                                    **Ronald H. Severaid,** SBN #78923, Pro hac vice pending
                                    rhseveraid@sbcglobal.net
                                    **Carter Glahn**, SBN #242378, Pro hac vice pending
                                    sandglaw-mail@yahoo.com
                                    1787 Tribute Rd., Suite D
                                    Sacramento, CA   95815
                                    916-929-8383 Phone/916-925-4763 Fax

                                    **LAW OFFICES OF JEFFERY K. PERKINS**
                                    **Jeffery K. Perkins,** SBN #57996, Pro hac vice pending
                                    jefferykperkins@aol.com
                                    1550-G Tiburon Blvd., #344
                                    Tiburon, CA 94920
                                    415-302-1115 Phone/415-435-4053

                                    Attorneys for Plaintiffs

**PLAINTIFFS**

James DeHoog
Grants Pass, OR

Shonna Bouteller
Grants Pass, OR

Tom Butterbaugh
Grants Pass, OR

Maria G. Corona
Grants Pass, OR

John DesBiens
Williams, OR

Cynthia A. Kreitzberg
Puyallup, WA

Jerusha Malaer
Bend, OR

Michael Martin
Northern CA

David Milligan
Central Point, OR

Ralph Reeder
Central Point, OR

Beth H. Silvers
Grants Pass, OR

Patrice Wade
Grants Pass, OR

Brian Bouteller
Grants Pass, OR

Carly Bowen
Grants Pass, OR

Erica I. Corona
Medford, OR

Chris Dennett
Medford, OR

Matthew Johnson
Medford, OR

Edward Lawrence
Tiberon, CA

Robert Malaer
Bend, OR

Michael McAtee
Arnold, CA

Jeff Reeder
Portland, OR

Wade Scaglione
Grants Pass, OR

Bradley O. Silvers
Grants Pass, OR

Exhibit 1
Page 1