Joseph M. Alioto, SBN # 42680
*Admitted Pro Hac Vice*
**ALIOTO LAW FIRM**
One Sansome Street
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: josephalioto@mac.com
        jmiller@aliotolaw.com

Christopher L. Cauble, OSB No. 962374
Rachele R. Selvig, OSB No. 095016
**CAUBLE, CAUBLE & SELVIG, LLP**
111 SE Sixth Street
Grants Pass, OR 97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704
Email: ccauble@thecaublefirm.com
        rselvig@thecaublefirm.com

*Attorneys for Plaintiffs*
(Full Listing of Counsel Follows Signature)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**MEDFORD DIVISION**

| | |
|---|---|
| JAMES DEHOOG, SHONNA BOUTELLER TOM BUTTERBAUGH, MARIA G. CORONA, DAVID MILLIGAN, BRIAN BOUTELLER MATT JOHNSON, BETH H. SILVERS, BRADLEY O. SILVERS, CYNTHIA KREITZBERG, RALPH REEDER, JOHN DESBIENS, MICHAEL MCATEE, TIM ANDERSON, CHRIS DENNETT, ROBERT MALAER, JERUSHA MALAER, PATRICE WADE, | Case No. 1:15-cv-02250 |
|                 Plaintiffs, | |
| v. | **Plaintiffs' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| ANHEUSER-BUSCH INBEV, SA/NV and SABMILLER, PLC, | **Request for Oral Argument** |
|                 Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................................ii

I.  RELIEF REQUESTED. ....................................................................................................1

II.  STATUTORY BASIS FOR THE RELIEF REQUESTED. ...................................................1

III.  ARGUMENT ..................................................................................................................1

    A.  STATEMENT OF FACTS................................................................................... 1

        i.  The Relevant Product Market. ................................................................. 3

        ii.  The Relevant Geographic Market. ............................................................ 3

        iii.  The U.S. Market for Beer is Very Highly Concentrated. ........................... 5

        iv.  The Proposed Acquisition Will Result in the Same Lessening of
            Competition That Followed and Was Caused By ABI's Acquisition
            of Grupo Modelo................................................................................... 7

            a.  ABI and SAB Do Not and Will Not Compete on Price................ 11

            b.  Plaintiffs Are Threatened By the Substantial Lessening of
                Competition That Will Result from the Acquisition..................... 12

            c.  ABI Controls the Largest Beer Distribution Network in the
                U.S. ....................................................................................... 14

        v.  ABI-SAB Will Have Monopsony Power Over Beer
            Product Inputs. .................................................................................. 21

    B.  LEGAL STANDARD FOR PRELIMINARY RELIEF .........................................25

        i.  Plaintiffs are Likely to Succeed on the Merits. ........................................ 26

        ii.  Plaintiffs Will be Irreparably Injured by Defendants' Combination......... 29

        iii.  Balance of Equities Favors the Plaintiff................................................... 29

        iv.  Public Interest is Served by Preliminary Relief. ...................................... 30

CONCLUSION. ........................................................................................................................30

# **TABLE OF AUTHORITIES**

## *Cases*

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946)...................................................... 28

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................... 26, 28

*Donald C. Winter, Sec'y Of The Navy, v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................................... 26

*Federal Baseball Club v. National League*, 259 U.S. 200 (1922)................................................ 27

*Flood v. Kuhn*, 407 U.S. 268 (1972)........................................................................................ 27

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967). .................................................................. 28

*Hospital Corp of America v. FTC*, 807 F.2d 1381 (7th Cir. 1986).............................................. 27

*United States v. Aluminum Co. of America*, 377 U.S. 271 (1964)............................................. 26

*United States v. Anheuser-Busch InBev NA/SV*, Civil No. 13-127
    (D.D.C. Apr. 19, 2013). ................................................................................................ 2

*United States v. Continental Can Co.*, 378 U.S. 441 (1964). ...................................................... 28

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ............................................. 26, 28

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ...................................................... 26, 27

*United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964)................................................. 28

*United States v. Philadelphia National Bank*, 374 U.S. 321 (1963)............................................ 26

*United States v. Topco Assocs.*, 405 U.S. 596 (1972).................................................................. 30

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966). ........................................................ 26

### *Acts*

Section 4 of the Clayton Act. ....................................................................... 30

Section 7 of the Clayton Act ........................................................... 1, 21, 26, 27, 28, 29

Section 16 of the Clayton Act. ..................................................................... 1

### *Statutes*

15 U.S.C. Sec. 15. ................................................................................ 30

15 U.S.C. Sec. 26. ................................................................................. 1

## I.    RELIEF REQUESTED

Plaintiffs seek an order to show cause why a preliminary injunction should not issue enjoining the proposed acquisition by ABI of SAB.  To enable them to prepare the motion for preliminary injunction, plaintiffs also seek discovery of defendants' Hart-Scott-Rodino documents, the transaction documents, depositions of key personnel, and other relevant documents.

## II.  STATUTORY BASIS FOR THE RELIEF REQUESTED

Section 16 of the Clayton Act, 15 U.S.C. Sec. 26, specifically provides for the relief requested in the following statutory language:

> Any person, firm, corporation or association shall be entitled to sue and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damages by a violation of the antitrust laws, including sections two, three, seven, and eight of this act, when and under the same conditions and principles as against threatened conduct under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue[.]

## III.   ARGUMENT

### A.  STATEMENT OF FACTS

There are few cases which present such a clear violation of Section 7 of the Clayton Act, and such a clear necessity for preliminary relief, as does this one.  A copy of plaintiffs' Complaint is annexed to the Declaration of Gil D. Messina ("Messina Decl.") as **Exhibit X**.

According to generally accepted economic and legal principles, fundamental to free markets is the principle that competition works best and consumers benefit most when independent firms battle hard to win business from each other.  In industries characterized by a

1

small number of substantial competitors and high barriers to entry, further concentration is especially dangerous and antithetical to the nation's antitrust laws.

The United States beer industry – which serves tens of millions of consumers at all levels of income – is highly concentrated with just two firms, the defendants, accounting for approximately 72% of all sales nationwide.  Messina Decl. **Exhibit A**.[1]  Further, this industry has been the subject of continuous mergers and acquisitions in recent years and reductions in the number of competitors that has intensified this high concentration.  The transaction which is the subject of this action threatens competition by combining the largest and second largest brewers of beer in the United States.  The approximate market shares of the two largest brewers in the United States are ABI with 46% and MillerCoors with 26%.  Other distant competitors and their approximate market shares are: Constellation at 6.7%; Heineken USA at 3.9%; Pabst at 2.5%; Boston at 1.9%; Yuengling at 1.4%; North American Breweries at 1.1%; Diageo Guinness USA at 1.1%; Mark Anthony Brands at 0.7%; and other smaller craft brewers at 10.0%.  Messina Decl. **Exhibits B, C**.[2]

---

[1] United States' Competitive Impact Statement ("CIS"), *United States v. Anheuser-Busch InBev NA/SV*, Civil Action No. 13-127 (Dkt. No. 30, p.7) (D.D.C. Apr. 19, 2013).

[2] "Ensuring Competition Remains on Tap: The AB InBev/SAB Miller merger and the State of Competition in the Beer Industry," testimony by Diana L. Moss, Ph.D., president, American Antitrust Institute, before the Senate Judiciary Committee Subcommittee on Antitrust, Competition Policy and Consumer Rights on Dec. 8, 2015, last accessed February 2, 2016, http://www.antitrustinstitute.org/content/moss-says-%E2%80%9Cdevil-details%E2%80%9D-merger-remedy-fully-restores-competition-ab-inbevsabmiller-merger, citing Beer Marketer's Insights, Key Industry Data, Major Supplier Shipments and Share: 2014 vs 2013, last accessed February 2, 2016, at http://www.beerinsights.com/index.php?option=com_content&view=article&id=11&Itemid=14.

### i.   The Relevant Product Market

The relevant product market in which to test the ABI-SAB combination is beer.  Messina

Decl. **Exhibit A**.[3]  There are no economic substitutes for beer in that other alcoholic beverages

contain different levels of alcohol, different ingredients, different methods of manufacture,

different capital investment, different distribution systems, and different prices.

### ii.  The Relevant Geographic Market

The geographic market in which to test the ABI-SAB combination is the United States as

a whole, as well as numerous local submarkets.  Messina Decl. **Exhibit A**.[4]

Both ABI and SAB are national brewers.  A combined ABI and SAB, each of which

already possesses significant competitive advantages over smaller competitors, will possess

greater competitive advantages since it will be able to exercise greater control of the channels of

distribution to exclude and disadvantage smaller competitors, exercise greater control over the

inputs of production – such as hops, cans, bottles, etc. – to its advantage and to the disadvantage

of smaller competitors, it will expand its advertising on a nationwide basis, gaining greater

exposure and prestige for its beers than those of smaller regional or local brewers, and it will

become even less affected by weather or labor problems in any particular region which will

disproportionately affect smaller brewers.  Messina Decl. **Exhibit D**.[5]

---

[3] See n.1, CIS at p.6.

[4] *Id.*

[5] "1 Drink Too Many: Why Consumers Will Lose With Beer Merger," Andre Barlow, LAW360, Nov. 12, 2015 (and sources cited), last accessed February 19, 2016, at http://www.law360.com/articles/726137/1-drink-too-many-why-consumers-will-lose-with-beer-merger

The proposal to exclude the MillerCoors portion of SAB's business from ABI's acquisition will not avoid the harm to competition that will otherwise result from ABI's acquisition of SAB.

When ABI acquired Grupo Modelo in 2012, the Department of Justice capitulated to ABI and settled its suit to prevent that acquisition when ABI agreed to an assignment of the right to sell Modelo's products (which included its highly successful Corona brand) in the United States. The theory being that if ABI did not sell Modelo's products in the United States, the downward pressure on beer prices that Modelo historically exercised through its so-called "Momentum Plan" would continue and because, according to the Justice Department, "the divestiture preserves the current structure of the beer market in the United States by maintaining an independent brewer with an incentive to resist following ABI's price leadership in order to expand share." Messina Decl. **Exhibit A**.[6] History has now shown that permitting ABI to acquire all of Modelo's non-U.S. business did not prevent the anticompetitive effects that were initially feared from occurring in the U.S.

Following ABI's acquisition of Grupo Modelo, the sales model for Modelo's U.S. sales was changed when – as many feared – in the summer/fall of 2015, Modelo led U.S. beer prices up for the first time. Messina Decl. **Exhibit E**.[7] ABI's proposal not to acquire SAB's interest in MillerCoors' beer business in the U.S. as part of its acquisition of SAB is purely pretextual. As discussed below, if allowed to proceed, the acquisition of SAB will, for reasons related to

---

[6] See n.1, CIS at p.10.

[7] "Your favorite beer might cost more soon," CNBC July 31, 2015, last accessed February 13, 2016, at http://www.cnbc.com/2015/07/31/your-favorite-beer-might-cost-more-soon.html.

4

marketing, distribution and product inputs, substantially lessen competition in the U.S. beer

industry, with particularly negative effects to redound to U.S. craft brewers, notwithstanding the

proposal not to acquire MillerCoors' business in the U.S.

### iii.   The U.S. Market for Beer is Very Highly Concentrated

The United States market for beer is substantially more than "highly concentrated."

Messina Decl. **Exhibit A**.[8]

> The AB InBev-SABMiller merger would take place against the backdrop
> of a highly concentrated market for beer in the U.S.  There have been five major
> mergers over the last 10 years.  In 2005, Coors and Molson merged to form
> Molson Coors Brewing Company.  In 2007, SABMiller and MolsonCoors formed
> the MillerCoors JV.  In 2008, InBev acquired Anheuser-Busch to form AB InBev.
> In 2012, AB InBev acquired Grupo Modelo.  The last two transactions were
> approved by the DOJ, subject to conditions that addressed increases in
> concentration and/or control of brewing or distribution that could be used to
> discriminate against rival brands. [Messina Decl. **Exhibit B**; see also **Exhibit F**.[9]]

Without considering the proposed divestiture of SAB's 58 percent share of the

MillerCoors JV, the merger would be presumptively illegal under U.S. antitrust law.  Messina

Decl. **Exhibit B**.[10]  ABI has about a 46 percent share of the U.S. beer market and SAB about 26

percent.  Messina Decl. **Exhibit D**.[11]   As measured by the objective standards of the generally

---------

[8] See n.1, *supra.*

[9] See n.2, *supra* at p.4, *citing* Bernard Ascher, Am. Antitrust Inst., "Global Beer: The Road to Monopoly 6–7 (2012); Ascher, Beeropoly: This is What the Family Tree of Beer Companies will Look Like if AB InBev Acquires SABMiller," at 56 Quartz, last accessed on February 19, 2016, at
http://qz.com/503392/this-is-what-the-family-tree-of-beer-companies-will-look-like-if-ab-inbev-acquires-sabmiller/.

[10] See n.2, *supra* at pp.6-7.

[11] See n.5, *supra.*

accepted Herfindahl-Hersh Index ("HHI") when taking into account current market participants, including smaller rivals, total market concentration is already at approximately 3,000 HHI. Messina Decl. **Exhibit G**.[12]  This is a highly concentrated market, according to the Department of Justice/Federal Trade Commission Horizontal Merger Guidelines.  ABI's acquisition of SAB would, according to the guidelines, be "presumed to be likely to enhance market power." Messina Decl. **Exhibit B**.[13]  The enhancement of ABI's market power as a result of the acquisition of SAB has already been forecast.  MillerCoors has announced its intention to withdraw substantial brewing capacity from the market following the merger On September 14, 2015 (two days before the announcement of merger talks), MillerCoors announced the closing of its Eden, North Carolina brewery by September 2016.  That plant alone has a capacity of nine million barrels per year, just over 10 percent of total MillerCoors brewing capacity.  MillerCoors describes the facility as "state of the art," and it has won numerous awards.  The planned closure of the Eden brewing facility raises fundamental questions about strategic intent" and may constitute "a merger-related, anticompetitive reduction in capacity," according to the American Antitrust Institute.  It will have the effect of increasing ABI's market power.  Messina Decl. **Exhibit B**.[14]

     If the acquisition is permitted to occur and Molson Coors acquires SAB's 58 percent interest in MillerCoors, Molson Coors (with brands, including, Coors Light, Miller Lite, and

---

[12] HHI measures and grades market concentration by adding the squared market share percentage of each competitor in the market.  See "Herfindahl-Hirschman Index" at http://www.justice.gov/atr/press-room, last accessed February 23, 2016.

[13] See n.2, *supra* at p.7.

[14] See n.2, *supra* at p.11.

Redd's) will turn Molson Coors into the world's fifth-largest brewer by volume and the second-largest brewer in the U.S.  In that event, "Molson Coors ... buying power for supplies ranging from hops to aluminum cans will be four times greater" following the consummation of ABI's acquisition of SAB, reportedly according to Molson Coors CEO Mark Hunter.  Messina Decl. **Exhibit H**.[15]  In addition, MillerCoors controls important SAB import brands, including Pilsner Urquell and Tyskie.  These brands will be produced by ABI after the merger and Molson will have to rely on ABI for its U.S. supply.  Messina Decl. **Exhibit W**.[16]

### iv.  The Proposed Acquisition Will Result in the Same Lessening of Competition That Followed and Was Caused By ABI's Acquisition of Grupo Modelo

Defendants' combined national market share actually understates the effect that eliminating SAB would have on the U.S. beer industry because of the interdependent pricing dynamic that already exists between the two largest brewers and, as the two largest brewers, ABI and MillerCoors often find it more profitable to follow each other's price increases than to compete aggressively for market share by cutting price.  Messina Decl. **Exhibit I**.[17]  This is a

---

[15] "Molson Expects More Leverage From MillerCoors Deal," Wall Street Journal, Nov. 12, 2015, last accessed February 13, 2016, at http://www.wsj.com/articles/molson-expects-greater-buying-negotiating-power-from-millercoors-deal-1447324201.

[16] Andre Barlow, "Senate needs a competition Jedi warrior to take a close look at the Anheuser-Busch InBev Empire," Antitrust Lawyer Blog, Dec. 7, 2015, last accessed February 29, 2016 at http://www.antitrustlawyerblog.com/senate-needs-a-competition-jedi-warrior-to-take-a-close-look-at-the-anheuser-busch-inbev-empire/

[17] Nathan H. Miller & Matthew Weinberg, Mergers Facilitate Tacit Collusion: An Empirical Investigation of the Miller/Coors Joint Venture (Mar. 25, 2015), pp.11-12, last accessed on February 19, 2016, at http://economics.yale.edu/sites/default/files/miller_mergers_facilitate_tacit_collusion.pdf.

situation that is likely to worsen if the ABI-SAB merger is permitted.  Among other things, ABI typically initiates annual price increases in accordance with its "Conduct Plan" with the expectation that MillerCoors will follow suit.  It generally does.  "According to ABI, its Conduct Plan 'increases the probability of [ABI] sustaining a price increase.'" Messina Decl. **Exhibit I**.[18]

ABI has 16 brands that individually generate more than $1 billion annually in revenue, out of a portfolio of more than 200 brands, which includes such global brands as Budweiser, Corona and Stella Artois, international brands such as Beck's, Hoegaarden and Leffe, and local brands such as Bud Light, Modelo Especial and Michelob Ultra.  Total revenue for all 200 ABI brands in 2014 was over $47 billion.  Messina Decl. **Exhibit J**.[19]  As previously stated, ABI is the largest seller of beer in the United States, accounting for more than 46% of the market.

SAB is a South African multinational brewing and beverage company, headquartered in London, England. It is the world's second largest brewer measured by revenues, after ABI. Its brands include Miller, Coors, Fosters, Grolsch, Peroni and Pilsner Urquell.  Messina Decl. **Exhibit K**.[20]  It has operations in 80 countries world-wide.  From the early 1990s onwards, the company has increasingly expanded internationally, making several acquisitions in both emerging and developed markets.  In 1999, it formed a new United Kingdom-based holding company, SAB plc.  In May 2002, SAB plc acquired Miller Brewing Company, forming

---

[18] *Id.* at p.12.

[19] AB InBev Annual Report 2014, pp.1-2.

[20] "A Budweiser-Miller brewing company would be a monster," <u>Business In</u>sider, Sept. 16, 2015, last accessed on February 21, 2016, at http://www.businessinsider.com/sabmiller-ab-inbev-would-dominate-the-beer-market-2015-9.

defendant SABMiller plc.  Messina Decl. **Exhibit L**.[21]

On July 1, 2008, SAB and Molson Coors Brewing Company, then the number two and three brewing companies in the United States, respectively, combined their operations and began operating a joint venture in the United States.  The joint venture, MillerCoors, LLC, is headquartered in Chicago, Illinois.  Its brands include: Miller Lite, Miller Genuine Draft, Coors Banquet, Coors Light, Olde English 800, Milwaukee's Best and Hamm's.  The company also offers a variety of craft and import brands, including Blue Moon and Leinenkugel's, through its Tenth and Blake division.[22]  MillerCoors also brews numerous brands of beer owned by Pabst Brewing Company (comprising 2.5 percent of the U.S. market (see p.2 above)), which will fall under the control of ABI post-merger.  Messina Decl. **Exhibit M**.[23]  MillerCoors is the second-largest beer company in the United States with nearly 30 percent of U.S. beer sales.  Total revenue for all SAB brands in 2015 was over $26.3 billion.  Messina Decl. **Exhibit L**.[24]

On October 13, 2015, the deal by ABI to acquire SAB was first announced.  On November 11, 2015, the purchase price was reported to be approximately $108 billion.  The deal would unite the world's two biggest beer makers and control more than half the world's beer profits.

---

[21] SABMiller Fact Sheet, last accessed February 21, 2016, at http://www.sabmiller.com/docs/default-source/default-document-library/sabmiller-factsheet.pdf?sfvrsn=4.

[22] See MillerCoors website, last accessed February 21, 2016, at http://www.millercoors.com/beers/great-beers.

[23] "These 11 brewers make over 90% of all U.S. beer," Market Watch, last accessed February 21, 2016, at http://www.marketwatch.com/story/these-11-brewers-make-over-90-of-all-us-beer-2015-07-27.

[24] See n.21, *supra*.

The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. The threshold for a "highly concentrated" market is an HHI of 2,500. Transactions that increase the HHI in highly concentrated markets by more than 200 points are presumed likely to enhance market power under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission. Messina Decl. **Exhibit G**.[25] Here, the market concentration will substantially exceed that number.

The HHI of the United States beer market in 2014 was 2,751. It has been reported by experts that ABI's acquisition of SAB would increase the HHI by 2,998 points. However, even assuming a complete divestiture of SAB's U.S.-marketed beers, the HHI would increase by at least 200 points in this already highly-concentrated U.S. market and would be presumptively illegal under government guidelines and would leave ABI with the enhanced "incentive and ability to exclude rival brewers from access to efficient distribution and thus from meaningful access to retail shelf space." Messina Decl. **Exhibits B** and **D.**[26] The post-merger HHI plainly indicates a market ripe for probable, if not certain, collusion and a galloping tendency toward monopoly. The market concentration measures, coupled with the significant increases in concentration, demonstrate that the acquisition is presumed to be anticompetitive. Messina Decl. **Exhibit B**.[27]

---

[25] See n.12, *supra*.

[26] See n.2, *supra* at p.7 and n.5, *supra*.

[27] See n.2, *supra* at p.7.

### a.   ABI and SAB Do Not and Will Not Compete on Price

ABI and SAB have actively competed in the United States, although not generally with regard to price.  An interdependent pricing dynamic exists between ABI and SAB in the United States.  These two largest brewers find it more profitable to follow each others' prices rather than compete aggressively for market share by cutting price.  ABI typically initiates annual price increases in various markets with the expectation that SAB will follow.  SAB usually does.

> ABI is usually first to announce its annual price increases, setting forth recommended wholesale price increases designed to be transparent and to encourage others to follow. MillerCoors typically announces its price increases after ABI has publicized its price increases, and largely matches ABI's price increases.  As a result, although ABI and MillerCoors have highly visible competing advertising and product innovation programs, they do not substantially constrain each other's annual price increases. [Messina Decl. **Exhibit A**.[28]]

The proposed acquisition would further concentrate the beer industry, enhancing ABI's market power and facilitating continued pricing collusion between ABI and Molson Coors (which is proposed to acquire all of MillerCoors' business in the U.S.) and what will be the next largest brewer, Constellation Brands, Inc. ("Constellation"), which markets ABI-owned Modelo's Mexican beer products ("Modelo") in the United States, including the country's largest selling import, Corona, under an exclusive license from ABI.  Messina Decl. **Exhibit I**.[29]  The upward pressure on prices following ABI's acquisition of Modelo is discussed below.

---

[28] See n.1, *supra* at p.7.

[29] See n.16, *supra* at p.11 ("There is substantial qualitative evidence that the ABI and MillerCoors price increases are due to tacit collusion in the wake of the Miller/Coors merger.")

**b.  Plaintiffs Are Threatened By the Substantial Lessening of Competition That Will Result from the Acquisition**

Plaintiffs are consumers and purchasers of defendants' beers and are threatened with loss and damage in the forms of higher prices, fewer services, fewer competitive choices, diminished product quality and product diversity, suppression and destruction of smaller actual competitors through exclusive distribution arrangements, full-line forcing, and the like, and other anticompetitive effects and consequences that may, and most probably will, result from the elimination of actual and potential competition if the acquisition by ABI of SAB is consummated.

Defendant ABI and SAB have attempted to cover up their scheme and create a mirage of competition by having SAB divest its interest in the MillerCoors joint venture to Molson Coors. This is essentially the scheme ABI used to seduce the Justice Department into dropping its suit to prevent ABI's acquisition of Modelo.  Messina Decl. **Exhibits N** and **M**.[30]  Rather than preserving Modelo's policy to restrain prices in the face of ABI and SAB price hikes, that merger has now led to higher prices, with Modelo for the first time initiating price increases last year. Messina Decl. **Exhibit E**.[31]  Similarly, SAB's historical collusion with ABI in leading beer prices

---

[30] Similarly, before Anheuser-Busch's merger with InBev in 2008, the Justice Department required InBev to divest the U.S. rights to market and distribute Labatt Beer.  Orley Ashenfelter, Daniel Hoskin and Matthew Weinberg, Efficiencies Brewed: Pricing and Consolidation in the U.S. Beer Industry (Aug. 14, 2013), p.8.  Last accessed February 21, 2016, at https://www.ftc.gov/sites/default/files/documents/public_events/Federal%20Trade%20Commissi on%20Microeconomics%20Conference/weinberg.pdf.  Yet, Labatt's U.S. distribution remains owned by ABI.  See n.21, *supra* at p.2.

[31] See n.7, *supra* ("Constellation Brands was the first to be reported to be planning a price hike. ... [T]he company plans to raise prices by 3 percent in some states this fall ... .  In California and Florida, prices will rise by about 75 cents.  California accounts for about 25 percent of Constellation's total sales volume.")

upward will be given freer rein if ABI's acquisition of SAB is permitted.

> This tacit collusion is likely to increase now that Molson will take ownership of MillerCoors. ...  Additionally, the U.S. market may exhibit even more characteristics of a duopoly now that MillerCoors is united under a single leadership, meaning that MillerCoors may be more likely to follow ABI on its strategies including price, dealings with suppliers, and dealing with distributors. [Messina Decl. **Exhibit D**.[32]]

Before it was completely acquired by ABI in 2013 for $20.1 billion, Modelo's U.S. distributor had consistently resisted pressure to follow ABI-led price hikes, unlike SAB, which tended to follow ABI's increases.  Modelo's then pricing strategy, called the "Momentum Plan," sought to maintain a narrow "price gap" between Modelo's beers and ABI's lower-priced premium domestic brands, such as Budweiser and Bud Light.  Modelo put "increasing pressure" on ABI by pursuing a competitive strategy directly at odds with ABI's well-established practice of leading beer prices upward.  Before Modelo's merger with ABI, ABI and SAB were forced to offer lower prices and discounts for their brands to discourage consumers from "tradeing up" to Modelo's better brands.  Messina Decl. **Exhibits D** and **I**.[33]  When ABI acquired the remaining interest in Modelo that it did not already own in 2013 and vested sole U.S. distribution rights for Modelo's U.S. sales in Constellation Brands, this competitive constraint on ABI's and SAB's ability to raise prices was eliminated.

---

[32]  See n.5, *supra*.

[33]  See n.1, *supra* at p.8 ("This competitive strategy narrowed the price gap between Modelo's high-end brands and ABI's and MillerCoors's premium and premium plus brands, allowing Modelo to build market share at the expense of ABI and MillerCoors. By compressing the price gap between high-end and premium brands, Modelo's actions have increasingly limited ABI's ability to lead beer prices higher").  See also n.16, *supra* at p.13.

13

The ABI-Modelo merger eliminated the substantial head-to-head competition that then existed between ABI and Modelo in the United States.  The loss of this head-to-head competition enhanced the ability of ABI to unilaterally raise the prices of the brands it owned post-merger, diminished ABI's incentive to innovate with respect to new brands, products, and packaging and, as stated above, has for the first time resulted in Modelo brands leading beer prices upward in the United States, despite assurances from the Department of Justice when it settled its suit to enjoin ABI's acquisition of Modelo that the merger would not result in Modelo leading beer price increases in the U.S.

According to Dr. Diana Moss of The American Antitrust Institute, "Today two firms, AB InBev and MillerCoors, control almost three-quarters of the U.S. beer market.  Data show that prices for beer have increased in the U.S., above the rate of inflation and against the backdrop of declining output.  And recent economic analysis indicates that following the formation of the MillerCoors JV, price increases were related to post-merger tacit coordination between AB InBev and MillerCoors."  Messina Decl. **Exhibit B**.[34]

### c.   ABI Controls the Largest Beer Distribution Network in the U.S.

ABI continues to own distributors in key U.S. markets which allows it to control the marketing and distribution of the products of other, smaller brewers in those markets.  Despite warnings and complaints raised at the time of the Justice Department's settlement in 2013 that ABI's continued control of these distributors would allow it to engage in anticompetitive activities, including by limiting craft brewers' access to ABI-owned distributors and, in turn, restricting access to retail outlets, and allowing ABI to increase the price of Modelo's products

---

[34] See n.2, *supra* at p.4.

through ABI's own distributors, these warnings were ignored by the Department of Justice and the court which ultimately approved the settlement. The harms which were warned of have come to pass. The prices of ABI's products in the U.S., including Modelo's brands, have increased since the merger and competitors, particularly small craft brewers, have been injured by ABI's recent practices.

ABI has the country's largest network of independent distributors/wholesalers, numbering approximately 600, with $3 billion in sales and 135 million in case volume, in addition to being the largest beer supplier. After the merger, Molson Coors will have exclusive control over 26 percent of U.S. beer sales, or more than the next eight largest brewers combined. Messina Decl. **Exhibit D**.[35]

Most of ABI's independent distributors and the other distributors that are owned directly by ABI in the U.S. operate under exclusive agreements with ABI in which they agree not to deal with the products of any competitors and not to distribute any products outside of their own designated territories. Messina Decl. **Exhibit B**.[36] Included are ABI-owned distributors/ wholesalers in the following 13 cities: Boston, Massachusetts; Canton, Ohio; Denver, Colorado; Eugene, Oregon; Los Angeles, California; Louisville, Kentucky; New York, New York; Oahu, Hawaii; Oklahoma City, Oklahoma; Pomona, California; Riverside, California; San Diego, California; and Tulsa, Oklahoma. Messina Decl. **Exhibit O**.[37]

---

[35] See n.5, *supra*.

[36] See n.2, *supra* at p.6.

[37] "Wholesaler Operations," Anheuser-Busch Company, last accessed at February 24, 2016, at http://anheuser-busch.com/index.php/our-company/operations/wholesale-operations/.

ABI has already embarked on a plan to restrain the distribution of competitors' products, including those of craft brewers, through its own distributors, as well as through other, non-ABI-owned distributors whom it pressures to obstruct the distribution of competitors' products.   Messina Decl. **Exhibit P**.[38]  With specific reference to a potential ABI-SAB merger, the American Antitrust Institute warned the Department of Justice in November 2014, that "[o]n account of its size, ABI already exercises a domineering presence over its distributors.  For a distributor, a falling out with ABI could mean losing brands that account for 40 percent of the national market – a figure that is certainly higher in many markets."  Messina Decl. **Exhibit Q**.[39]

To further enhance the effectiveness of its anticompetitive practices, ABI has embarked on a plan to acquire additional distributors around the United States.  On October 12, 2015, the Department of Justice announced that it has launched an investigation into ABI's practices, including the acquisition of two distributors in the San Jose and Oakland, California markets.  Reuters reported:

> The U.S. Justice Department is probing allegations that Anheuser-Busch InBev (ABI.BR) is seeking to curb competition in the beer market by buying distributors, making it harder for fast-growing craft brewers to get their products on store shelves, according to three people familiar with the matter.
> In the past few months, ABI has rattled the craft beer world by striking deals for five distributors in three states.  Many states require brewers to use distributors to sell

---

[38] "Exclusive: U.S. probes allegations AB InBev seeking to curb craft beer distribution," Reuters, Oct. 12, 2015, last accessed February 17, 2016, at http://www.reuters.com/article/us-abinbev-doj-antitrust-exclusive-idUSKCN0S623R20151012.

[39] Letter from Albert Foer, President, and Sandeep Vaheesan, Special Counsel, American Antitrust Institute, to William J. Baer, Assistant Attorney General, U.S. Department of Justice, Nov. 19, 2014, last accessed February 20, 2016, at http://www.antitrustinstitute.org/sites/default/files/AAI-%20Beer%20merger,%20to%20DOJ%2011-19.14.pdf.

their product, and once AB InBev buys a distributor, craft companies say they find that they can't distribute their beer as easily and sales growth stalls.

Antitrust regulators are also reviewing craft brewers' claims that AB InBev pushes some independent distributors to only carry the company's products and end their ties with the craft industry, two of the sources said, noting that the investigation was in its early stages. [Messina Decl. **Exhibit P**.[40]]

Although ABI is under investigation by the Justice Department for anticompetitive

distribution practices, the company brazenly announced at its annual meeting of distributors in

St. Louis in November 2015, a new so-called "Voluntary Incentive Program" that targets small

and craft brewers.  The attendees were instructed not to disclose the new program.  Messina

Decl. **Exhibit R**.[41]    However, on December 7, 2015, the Wall Street Journal reported:

Anheuser-Busch InBev NV's new plan to reverse declining volumes in the U.S. – by rewarding distributors who focus on brands like Budweiser and Bud Light – is raising alarm among craft brewers who worry it will make it harder to get shelf space for their IPAs and porters.

The world's largest brewer last month introduced a new incentive program that could offer some independent distributors in the U.S. annual reimbursements of as much as $1.5 million if 98% of the beers they sell are AB InBev brands, according to two distributors who requested confidentiality because they were asked not to discuss the plan.  Distributors whose sales volumes are 95% made up of AB InBev brands would be eligible to have the brewer cover as much as half of their contractual marketing support for those brands, which includes retail promotion and display costs.

AB InBev, which introduced the plan at a meeting of distributors in St. Louis, estimates participating distributors would receive an average annual benefit of $200,000 each. [Messina Decl. **Exhibit S**.[42]]

---

[40] See n.38, *supra.*

[41] "AB-InBev incentive program potentially a huge blow to craft beer," Craft Brewing Business, Dec. 9, 2015, last accessed February 24, 2016, at http://www.craftbrewingbusiness.com/packaging-distribution/ab-inbev-incentive-program-potentially-huge-blow-craft-beer/

[42] "Craft Brewers Take Issue With AB InBev Distribution Plan," Wall Street Journal, Dec. 7, 2015, last accessed February 16, 2016, at http://www.wsj.com/articles/craft-brewers-take-issue-with-ab-inbev-distribution-plan-1449227668.

In addition, ABI reportedly told its distributors they could qualify for the new incentive

program if the craft brewers they carry produce less than 15,000 barrels or sell beer in only one

state.  At least one distributor in St. Louis has already dropped the Oregon brewer of the craft

beer, Mirror Pond Pale Ale, because, according to the brewer, the distributor "'had to make a

choice to go with the incentive program or stay with the craft.'"  Messina Decl. **Exhibit S**.[43]

The beer market in the United States is predominantly a three-tiered system because state

regulations in most states require that the brewer sell to a distributor who in turn sells to retailers.

In its challenge to ABI's acquisition of Modelo, the Department of Justice demonstrated that,

"[e]ffective distribution is important for a brewer to be competitive in the beer industry."

Messina Decl. **Exhibit A**.[44]  ABI has pursued a strategy of exclusivity and has in the past given

more favorable terms to distributors who only sell brands owned by ABI.  This 100 percent share

strategy – on which ABI has now doubled down – "has led ABI to pressure distributors to drop

other brewers' brands."  Messina Decl. **Exhibit D**.[45]

Since the proposed merger contemplates SAB's interest in the MillerCoors joint venture

being sold to Molson Coors, it is likely that a 100 percent Molson Coors-owned MillerCoors will

adopt ABI practices in dealing with distributors.

> Before the MillerCoors joint venture, SABMiller and Molson Coors successfully
> shared distributorships and recognized the importance of being open to many
> suppliers.  Likely, they chose this strategy, as it was under the management of
> SABMiller and Molson.  Given the change in management and Molson's new
> increased size and scope in the U.S. market, Molson's management may have

---

[43] *Id.*

[44] See n.1, *supra* at p.15.

[45] See n.5, *supra.*

different incentives.  For example, Molson could change its policy and pressure distributors to stop carrying white beers that compete with Blue Moon, which Molson will get U.S. rights over in this deal. [Messina Decl. **Exhibit D**.[46]]

This would be much the same as what Constellation did after obtaining the exclusive license from ABI to market Modelo's brands in the U.S. after the ABI-Grupo Modelo combination.  Last fall, Modelo products led beer prices up in the U.S. for the first time rather than acting as the traditional, deliberate restraint on price increases it had been in the past.  In short, Modelo's "Momentum Plan" is dead, despite the Justice Department's delusional insistence it would survive ABI's acquisition of Grupo Modelo.  Messina Decl. **Exhibits D** and **E**.[47]

Referring again to an ABI-SAB combination, the American Antitrust Institute informed the Justice Department: "With an even larger market share, ABI would have more power over distributors and more to gain from excluding rivals."  Messina Decl. **Exhibit Q**.[48]

Predictably, small craft brewers have been rattled by ABI's recent purchases of craft beer makers, including Golden Road Brewing in September 2015, Blue Point Brewing in 2014 and Goose Island Beer Co in 2011.  On December 22, 2015, ABI announced it had acquired three craft brewers in a span of five days.  This was in addition to its acquisition of five distributors in three states in the past few months.  An executive of a craft brewer is reported to have said that ABI recently bought one of its distributors: "It [the distributor] is slowly but surely divesting itself of everything that is not ABI.  And we're one of the last ones," said the executive, who

---

[46] *Id.*

[47] *Id.* and n.7, *supra.*

[48] See n.39, *supra.*

noted that its other options for distribution were limited.  "We're at the mercy of a lot of big players."  Messina Decl. **Exhibit P**.[49]  To retain the "craft" title, a brewery must make less than six million barrels annually.  That means those that are taken over by a big brewer like ABI lose that identity even if they still make small batches with distinctive flavors.  Messina Decl. **Exhibit P**.[50]

ABI's now operative strategies of rewarding distributors who deal exclusively in ABI's products, buying up key distributors it does not already own, and buying up successful craft brewer competitors is already increasing its market power, greatly increasing concentration in the market and substantially lessening competition that will be grossly exacerbated if the ABI-SAB merger is permitted.  These events and the Justice Department's investigation come at a time when ABI, the biggest beer brewer in the U.S. and world, is seeking to buy the number two brewer in the U.S. and world, SAB, for an estimated $108 billion in what would be the biggest merger of brewers in history.

ABI's acquisition of SAB will cause competitive harm to U.S. beer consumers by further enhancing ABI's ability to unilaterally raise the prices of SAB and other brands it will own post-merger, and diminish ABI's incentive to innovate with respect to new brands, products, and packaging.

Based on past history, presently announced intentions, and anticipated future conduct, unless restrained and enjoined, defendants will consummate their combination, stifle competition

---

[49] See n.38, *supra*.

[50] *Id.*

and raise prices in clear violation of Section 7 of the Clayton Act, to the irreparable injury of plaintiffs and the public and contrary to the public welfare.

ABI's spending sprees have caused it to incur billions of dollars in additional debt.  The injury to competition and consumers will worsen if the SAB acquisition occurs, leaving ABI with about $110 billion in net debt, or roughly 4.5 times the new firm's combined EBITDA in the following year.  Messina Decl. **Exhibit T**.[51]  Then, ABI will be under even greater pressure to increase prices.  Messina Decl. **Exhibit D**.[52]

### v.   ABI-SAB Will Have Monopsony Power Over Beer Product Inputs

As stated above, the world's largest brewer, ABI, already has enormous economic power and capabilities with 16 brands alone that each generate over $1 billion per year in revenue out of a portfolio of more than 200 brands and total revenues in 2014 for all ABI brands world-wide of more than $47 billion.  After acquiring SAB, ABI's post-merger prowess will afford it monopsony power over the commodities used in brewing and packaging beer in the United States.

Experts have concluded that ABI's new global scale, if the acquisition of SAB is permitted, will give it leverage over the commodities used in brewing beer and many other facets of the beer industry that will likely affect competition in the United States. The proposed merger would increase ABI's buying power by allowing ABI to potentially control over 30 percent of

---

[51] "AB InBev-SAB Deal Tastes Great But Will It Be More Filling?," <u>Wall Street Journal</u>, Nov. 11, 2015, last accessed February 20, 2016, at http://www.wsj.com/articles/ab-inbev-sab-deal-tastes-great-but-will-it-be-more-filling-14472564 21.

[52] See n.5, *supra.*

total worldwide beer production.  A combined ABI-SAB would have 58 percent of the global

beer profit pool which far outweighs Heineken's 11 percent, its next closest competitor.  Messina

Decl. **Exhibit D**.[53]

The Brewers Association has stated with respect to the proposed ABI-SAB merger: "A-B

InBev's new international footprint and scale give the company greater influence over

commodities used in brewing and many other facets of the beer industry that could affect

competition in the U.S. market."  Messina Decl. **Exhibit U**.[54]

Post-merger buyer power is important because it can harm not only input sellers, but also

other buyers.  The beer industry, and especially small buyers like craft brewers, is particularly

vulnerable to what is known as the "waterbed effect" due to capacity issues involved in the

brewing and packaging of beer.  Messina Decl. **Exhibit D**.[55]  The waterbed effect occurs when a

powerful buyer demands lower prices or other concessions from its suppliers, causing the

supplier to, in turn, increase prices to smaller buyers or offer them otherwise worse terms.[56]

Hops are an essential ingredient in beer. Hops shortages occur frequently. Hops can only

---

[53] *Id.*

[54] "Brewers Association warns Anheuser-Busch InBev deal could stifle US market," just drinks, Nov. 13, 2015, last accessed, February 22, 2016, at http://www.just-drinks.com/news/brewers-association-warns-anheuser-busch-inbev-deal-could-stifle-us-market_id118665.aspx.

[55] See n.5, *supra.*

[56] The "waterbed effect" is defined by The Financial Times of London thusly: "A 'waterbed effect' occurs in two-sided markets when prices are pushed down, say through regulation, on only one side of the market, resulting in a re-balancing of prices on the other side - much like a waterbed would react if you were to push down one side of it."  Last accessed on February 17, 2016 at http://lexicon.ft.com/Term?term=waterbed-effect.  See also n.5, *supra.*

be grown in a limited geographic area and require a lot of water to grow. Hop growing also has high startup costs and high quality hop plants can take years before they hit full production. These factors lead to frequent hops shortages that disproportionately impact craft brewers. Hops come in many varieties that can be roughly divided into two categories: bitter hops used in traditional lagers and aroma hops used predominantly by craft brewers to make more flavorful beers. ABI is a powerful buyer in the bitter hops market, which is highly commoditized, but does not yet have much market power in the aroma hops market. The proposed deal may depress prices in the bitter hops market due to ABI's buyer power and other large purchasers who put pressure on their suppliers to compete with ABI's lower costs. This may well cause U.S. farmers to abandon the bitter hops market in favor of more profitable aroma hops, further decreasing the ability of other buyers to compete on lager style beers. Messina Decl. **Exhibit D**.[57]

Moreover, in the packaging of beer, large can-maker Crown Holdings, Inc. (formerly the partner with Constellation in the joint venture that distributed Modelo's products in the U.S. before ABI acquired Modelo) is reported to have recently dropped both new and existing small craft customers and lengthened lead times, suggesting capacities are becoming limited in the industry. Messina Decl. **Exhibit D**.[58] The packaging of beer is likely to become even more precarious for craft brewers because U.S. drink can maker Ball Corp. is in the process of buying U.K. can manufacturer Rexam PLC in a proposed $7.7 billion deal that recently received European Union approval. The two companies are the largest can manufacturers in the world, whose customers include ABI and Heineken and the transaction "triggered concern from

---

[57] See n.5, *supra*.

[58] *Id.*

regulators around the globe ... [that] the deal may reduce competition and drive up prices for consumers." The FTC has yet to weigh in on the deal. Messina Decl. **Exhibit V**.[59] The shortages of hops and can packaging disproportionately impact craft brewers. Messina Decl. **Exhibit D**.[60] J. Wilson, coordinator for the Iowa Brewers Guild, testified before the Senate Judiciary Committee Subcommittee on Antitrust, Competition Policy and Consumer Rights on December 8, 2015, as follows:

> 'While market access is an on-going battle that small craft brewers have infiltrated by offering a wide range of locally-produced, flavor-forward products, the ability to produce or package them could soon be hindered if the merger is allowed,' Wilson said. 'This mega-brewery would have an even greater impact on brewing inputs such as malted barley and hops and packaging materials like bottles and cans. The hops supply is already tenuous and while malt production can easily be increased, expansion of hops acreage is costly and hop plants take three years to reach maturity.' [Messina Decl. **Exhibit R**.[61]]

ABI's increased buyer power would mean that it would more likely get the inputs it wants, in the quantities it wants, and at the terms it wants. This is likely to disadvantage input providers, as ABI is notorious for demanding extremely favorable terms like 120-day payment terms. ABI's increased monopsony power is also likely to mean worse terms for every other buyer in the market, not just because suppliers are likely to raise prices to recover lost profits, but because of capacity limitations as well. Smaller buyers are likely to experience delays, poorer

---

[59] "EU Approves $7.7B Ball-Rexam Deal With Antitrust Fixes," Law360, Jan. 16, 2016, last accessed February 22, 2016, at http://www.law360.com/articles/747087/eu-approves-7-7b-ball-rexam-deal-with-antitrust-fixes.

[60] See n.5, *supra.*

[61] See n.41, *supra.*

terms, and even unavailability.  Messina Decl. **Exhibit D**.[62]  At the same time, it has been

reported that, post-merger, Molson Coors' "buying power for supplies ranging from hops to

aluminum cans will be four times greater following its $12 billion deal for MillerCoors LLC and

the Miller beer brands, Chief Executive Mark Hunter said."  Messina Decl. **Exhibit H**.[63]  ABI

would also be likely to exert its buyer power strategically to disadvantage rivals in this way,

much as it is disadvantaging them through the new Voluntary Incentive Program it has

implemented for its distributors who agree to drop competing brands.

 The American Antitrust Institute has expressed similar monopsony concerns: "the

proposed merger could also raise potential adverse effects on upstream input ingredient markets

(e.g., hops)."  Messina Decl. **Exhibit B**.[64]

 Finally, the plaintiffs have registered their concerns regarding the proposed acquisition of

SAB by ABI and the irreparable harm that is likely to befall them as consumers if the merger is

permitted, by diminished competition resulting in the loss or reduction of product choices and

quality, particularly in terms of craft beers, and the usual increases in price that historically have

followed the recent mergers in the U.S. beer industry.[65]

## B.  LEGAL STANDARD FOR PRELIMINARY RELIEF

 A plaintiff seeking a preliminary injunction must establish a likelihood of success on the

merits, a likelihood of incurring irreparable harm in the absence of preliminary relief, that the

---

[62] See n.5, *supra*.

[63] See n.15, *supra*.

[64] See n.2, *supra* at p.2.

[65] See the Declarations of James De Hoog, Carly Bowen, Matthew Johnson, Cynthia
Kreitzberg, Jerusha Malaer, Robert Malaer and Michael McAtee.

balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest.

*Donald C. Winter, Secretary Of The Navy, v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

### i.   Plaintiffs are Likely to Succeed on the Merits

The law governing this case was established in 1966 by the United States Supreme Court in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) when the Supreme Court reversed the district court and remanded the case for further proceedings in conformity with its decision. Before the Court at that time was the acquisition of the eighteenth largest beer brewer (Blatz) in the United States by the tenth largest brewer (Pabst) in the United States.  The evidence demonstrated the market shares, power, and competition in the relevant areas, and the steady decline in the number of brewers. The Court held that "the probable effect of the merger on competition in Wisconsin, the three state area, and the entire country was sufficient to show a violation of Sec. 7 in each and all three of these areas."  *Id.* at 552.

In addition to *Pabst*, the proposed acquisition is contrary to the following long-established decisions by the United States Supreme Court: *Brown Shoe Co. v United States*, 370 U.S. 294 (1962); *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963); *United States v. Aluminum Co. of America*, 377 U.S. 271 (1964); *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966); *United States v. Falstaff Brewing Co.*, 410 U.S. 526 (1973).  As Judge Posner of the Seventh Circuit observed, these cases have never been overruled, and "[t]aken as a group, . . . establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing.  The elimination of a significant rival was thought by itself to infringe the complex of social and

26

economic values conceived by a majority of the Court to inform the statutory words 'may . . .

substantially . . . lessen competition.'" *Hospital Corp of America v. FTC*, 807 F.2d 1381,

1386 (7th Cir. 1986). *See also Flood v. Kuhn*, 407 U.S. 268, 283-284 (1972), in which the

Supreme Court, as a matter of *stare decisis*, upheld its ruling in *Federal Baseball Club v.*

*National League*, 259 U.S. 200 (1922), stating: "We continue to be loath, 50 years after Federal

Baseball and almost two decades after *Toolson*, to overturn those cases judicially when Congress,

by its positive inaction, has allowed those decisions to stand for so long and, far beyond mere

inference and implication, has clearly evinced a desire not to disapprove them legislatively."

ABI and SAB have actively competed in the United States, although not generally with

regard to price. An interdependent pricing dynamic exists between ABI and SAB in the United

States. These two largest brewers find it more profitable to follow each others' prices rather than

compete aggressively for market share by cutting price. ABI typically initiates annual price

increases in various markets with the expectation that SAB will follow. Often it does. The

defendants' competition has, however, resulted in product innovations that have benefitted

consumers across the country. The proposed acquisition would eliminate this type of competition

by further concentrating the beer industry, enhancing ABI's market power, and facilitating

coordinated pricing between ABI and what will be the next largest brewer, Constellation Brands,

The *Pabst* case was not nearly as strong a section 7 case as is this one, but it is on all

fours. Clearly, the ABI-SAB combination will violate section 7 of the Clayton Act, as amended.

Under established Supreme Court precedent, there are other reasons why the proposed

transaction is anticompetitive. One is national advertising. In the words of the Supreme Court:

27

Such advertising is not here criticized as a business expense. Such advertising may benefit indirectly the entire industry, including the competitors of the advertisers. Such tremendous advertising, however, is also a widely published warning that these companies possess and know how to use a powerful offensive and defensive weapon against new competition. New competition dare not enter such a field, unless it be well supported by comparable national advertising. Large inventories of cigarettes, and large sums required for payment of federal taxes in advance of actual sales, further emphasize the effectiveness of a well financed monopoly in this field against potential competitors if there merely exists an intent to exclude such competitors. Prevention of all potential competition is the natural program for maintaining a monopoly here, rather than any program of actual exclusion. 'Prevention' is cheaper and more effective than any amount of 'cure.'

*American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946).

Another important factor in the ABI-SAB merger is the potential competition which will

be lost if the transaction is permitted to proceed:

Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co.*, 378 U.S. 441 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578-580 (1967). Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.*, 386 U.S., at 580-581; *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 173-174 (1964). As the Court stated in *United States v. Penn-Olin Chemical Co., supra*, at 174, 'The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated.' *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531 (1973).

### ii.   Plaintiffs Will be Irreparably Injured by Defendants' Combination

Based on past history, presently announced intentions, and anticipated future conduct, unless restrained and enjoined, defendants will consummate their combination and raise prices, reduce access to markets by smaller brewers generally, and reduce the number of craft brewers in particular, in clear violation of section 7 of the Clayton Act, to the irreparable injury of plaintiffs and the public.  If defendants are allowed to continue with the acquisition, they will comingle their assets, personnel, and pricing strategies to the point where separation is impossible.  In addition, they will immediately raise beer prices and extract illegal profits which is very difficult to rectify.

### iii.   Balance of Equities Favors the Plaintiffs

As demonstrated above, plaintiffs will suffer irreparable injury if the threatened acquisition is allowed to proceed.  On the other hand, defendants will suffer little or no harm if the acquisition is enjoined.  The defendants' acquisition has already been delayed by several months with no resulting harm to them and it does not appear that another few months, the period within which this case can be tried, will cause them harm.

Plaintiffs need little discovery.  They request production of the Hart-Scott-Rodino documents already collected and delivered to the Government and six to eight depositions from the top executives of ABI, SAB, MillerCoors and MolsonCoors, as well as documents relating to the post-merger impact on competition following ABI's acquisition of Grupo Modelo.  With this evidence plaintiffs will be able to demonstrate conclusively that the proposed acquisition will violate section 7 of the Clayton Act.

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.

### iv.   Public Interest is Served by Preliminary Relief

Economic and legal principles uniformly hold that competition best serves the public.  As the Supreme Court has said, the antitrust laws are the charter of our economic freedom. "Antitrust laws ... are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972).  If the proposed acquisition is completed and prices rise while competition is lost, the public will be damaged to an extent not subject to remediation.

## CONCLUSION

The acquisition of SAB by ABI, notwithstanding the spin-off SAB's MillerCoors business in the U.S. to MolsonCoors will constitute a clear violation of the antitrust laws.  Unless the requested relief is granted, plaintiffs and the public will be irreparably injured and this Court will lose the ability to rectify the situation.

Dated:   February 29, 2016            ALIOTO LAW FIRM

By:      *s/ Joseph M. Alioto*
                Joseph M. Alioto, SBN # 42680
                *Admitted Pro Hac Vice*

**ALIOTO LAW FIRM**
One Sansome Street
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
　　　josephalioto@mac.com
　　　jmiller@aliotolaw.com

Stephen G. Larson, SBN # 145225
*Admitted Pro Hac Vice*
Steven A. Haskins, SBN # 238865
*Admitted Pro Hac Vice*
**LARSON O'BRIEN LLP**
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000
Email:  slarson@larsonobrienlaw.com
　　　shaskins@larsonobrienlaw.com

Gil D. Messina, NJ Bar # 029661978
*Admitted Pro Hac Vice*
**MESSINA LAW FIRM, P.C.**
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (732) 332-9300
Facsimile: (732) 332-9301
Email: gmessina@messinalawfirm.com

Ronald H. Severaid, SBN # 78923
*Admitted Pro Hac Vice*
Carter Glahn, SBN # 242378
*Admitted Pro Hac Vice*
**SEVEREID & GLAHN, P.C.**
1787 Tribute Road, Suite D
Sacramento, CA 95815
Telephone: (916) 929-8383
Facsimile: (916) 925-4763
Email: rhsevereid@sbcglobal.net
　　　sandglaw-mail@yahoo.com

31

Jeffery K. Perkins, SBN # 57996
*Admitted Pro Hac Vice*
**LAW OFFICES OF JEFFERY K. PERKINS**
1550-G Tiburon Blvd., # 344
Tiburon, CA 94920
Telephone: (415) 302-1115
Facsimile: (415) 435-4053

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 8,618 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

      DATED this 29th day of February, 2016.

                                CAUBLE, CAUBLE & SELVIG, LLP


                                */s/ Rachele R. Selvig*
                                Christopher L. Cauble, OSB No. 962374
                                ccauble@thecaublefirm.com
                                Rachele R. Selvig, OSB No. 095016
                                rselvig@thecaublefirm.com
                                Of Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was served electronically via the Court's electronic filing system on the 29th day of February, 2016, according to this Court's provision for service and sent to the following counsel of record indicated below:

Michael G. Hanolon
LAW OFFICES OF MICHAEL G.
HANLON, P.C.
101 S.W. Main Street, Suite 825
Portland, OR 97204
mgh@hanlonlaw.com

J. Robert Robertson (*Pro hac vice*)
HOGRAN LOVELLS US LLP
555 Thirteenth St, NW
Washington, DC 20004
Tel: 202-637-5774
Fax: 202-637-5910
Robby.robertson@hoganlovells.com

*Attorneys for Defendant*
*SABMILLER PLC*

J . Matthew Donohue
Shannon Armstrong
MARKOWITZ HERBOLD PC
1211 SW Fifth Ave
Portland OR 97204-3730
MattDonohue@markowitzherbold.com
ShannonArmstrong@markowitzherbold.com

Yonatan Even *(Pro hac vice pending)*
CRAVATH, SWAINE & MOORE, LLP
WorldwidePlaza
825 Eighth Avenue
New York, NY 10019-7475
yeven@cravath.com

*Attorneys for Defendant*
*Anheuser-Busch InBev, SA/NV*

DATED this 29th day of February, 2016.

CAUBLE, CAUBLE & SELVIG, LLP


*/s/ Rachele R. Selvig*
Christopher L. Cauble, OSB No. 962374
ccauble@thecaublefirm.com
Rachele R. Selvig, OSB No. 095016
rselvig@thecaublefirm.com
Of Attorneys for Plaintiffs

34